Our next case 24 29 66 the United States versus Manzo Good afternoon, Mr. White. Good afternoon, your honors. May it please the court. My name is Brendan White together with co-counsel Anthony DiPietro and John Sekanek. We represent the appellant Thomas Manzo here. With the court's permission, I would respectfully request five minutes rebuttal time. Sure. Thank you. This was a highly unusual Vicar case in many respects. But what is not unusual is that in a Vicar case where the evidence of an enterprise-related purpose is insufficient, courts have not been shy and in fact frequently do vacate those convictions, even in cases in which there is a much stronger connection with organized crime than the defendant had here. Here, not only was the evidence of the enterprise-related purpose insufficient, the evidence that Mr. Manzo knew of that purpose was non-existent. Non-existent. The conversations about the banquet, what do you make of those? The wedding reception? Pardon? I'm sorry. What do you make of the conversations with respect to the wedding reception? Is that any evidence of anything? Mr. Manzo was the co-owner of a catering that served the community. They served law enforcement, they served hospital personnel, they served teachers, they served ordinary people celebrating family milestones. Any one of them would obviously want to have the nicest event they could possibly have. It's difficult to imagine what significance the fact that Mr. Perna had a wedding reception at the facility. The government's contention was that he wanted to impress the family, the organized crime family, that he could really put on a top-notch wedding. It sounds like he did. He did. Mr. Perna never said that. There's no evidence. Doesn't Mr. Tripoli, in effect, give testimony that brings that into play? He provided his own personal gloss. There was really no actual evidence of that. What was that gloss? Testimony is evidence, right? Of course. Yes, Your Honor. In any event, as far as Mr. Manzo was concerned- What was that gloss? What was that gloss? I think this is a very close case, frankly. The intent, it seems to me, I think, this is what you're arguing, that the court erred by not giving your jury instruction in terms of the intent of the person committing the assault vis-a-vis the intent of the person hiring the one to commit the assault. My concern is, let's assume for a second it's an aiding and abetting, it's sufficient if the defendant, the aider and abetter, is aware of the motive of the person doing the assault. And doesn't have to actually share, and I think that's part of the contention, doesn't have to share that motive. That's what I think makes it a very close case. You said Mr. Tripoli gave some detail, but help me with that. What was the detail? He provided- I'm happy to move on to the aspect that Mr. Manzo had absolutely no knowledge whatsoever of any enterprise-related purpose here. Well, that puts the lab in the hat, because their argument, I believe, is that Mr. Manzo, and I think his work is very, very close, that Manzo knew that Mr. Perna's motivation was to ingratiate himself into the Tripolis, I hope I'm pronouncing that correctly, was to ingratiate himself into the mob family. And that if, and I'll ask your opponent about this more closely, my concern is that if that's enough, and I think that's what the court charged, that's one scenario. But if it's required that Mr. Manzo share that purpose, that's a whole different scenario. And then it seems to me you're on pretty solid ground. I don't see the evidence establishing that. Yes, and frankly, Your Honor, I think even the government would concede there that there is no such evidence that Mr. Manzo shared any such motivation. But is it enough for Manzo to have known the motivation of the person that went out and beat up his former wife's boyfriend? Is that enough? Our position, of course, is that that is not. That the instruction given by the district court was incorrect. The Rosemond case, which was decided nine years ago at this point, eight years ago at the time of the trial, that provided a roadmap for what they were talking about. Spring Court case in Rosemond? Yes, correct. 2014, wasn't it? I thought it was. I have this 2016. I'm certainly willing to defer to your expertise. I could be wrong. I thought it was 2014. I'm willing to split the difference and say 2015. It's approximately 10 years old. It was 2014. Yeah. And- Every now and then. If it's trivial, I might know it. If it's important, I'll count on you. The court provided a roadmap for what they were talking about there. They described a kidnapping scheme, for instance, in which one person drove the getaway car. One person actually snatched the victim off the street. A third person acted as a lookout. And a fourth person provided the safe house and kept watch over the kidnapping victim. At that point, none of them committed every action of the kidnapping. But each of them committed a portion of it. And each of them aided and abetted one another in committing that completed offense. Here, the government, very cleverly, I'll give them the credit for that, were able to convince the district court judge that that scenario should be applied here, where there is a specific offense, a specific intent offense, namely Vicar, which has as an absolute core element that the purpose has to be, it's not merely an interstate nexus to satisfy the Commerce Clause. There has to be a general purpose of committing this offense to advance or maintain one's position. How do you distinguish the Supreme Court case Boza? I realize it's 77 years old. Nearly 80 years ago, in which case, apparently, according to the Supreme Court, it would have been common knowledge to most people that the purpose of a bootlegging offense was to avoid federal taxation. The bottom line, however- But I thought what Boza said, you don't have to share the principal's intent. In other words, you have the intent yourself. You just have to know that it's that person's intent, whether you share it or not. And you go forward in connection with that, Affirmative Acts, in connection with the crime. Well, two things with respect to that, Your Honor. One, in Boza, the defendant there was an actual participant in it. He clearly would have known exactly what was happening. That's not alleged here, and the evidence doesn't support it. Secondly, it was a situation in which it was not a specific intent crime, the way the bycar advance or maintain position is. That's an absolute core element. And just getting back for a moment to Rosemond, in the 9, 10, or 11 years since that case was decided, no court, and the government has had 18 months since the time of trial, no court has given an instruction similar to the one given in this district court. We've challenged them at every juncture, you know, show a case in which this was, the jury was instructed this way on this critical element, and none exist. Well, do you think there was enough record evidence that Perna wanted to have this fancy wedding to advance his position in the family? We certainly submit that there was not. This was as, just to go back to fundamentals, this was as simple, straightforward, and non-enterprise related as you could offer. But didn't Trapodi testify to that? I'm sorry? Didn't Trapodi testify to that? If you carefully parse the testimony, he did not testify that this is what Perna said to him. He testified as to his impressions of things. It did not directly go to Perna's actual mindset. You say what gave him that impression?  Did you say what gave him that impression? His general, having been around the ether, led him to that conclusion. It was nothing Perna said to him because Trapodi said it. But had Manzo been around the ether, as you put it, to the same extent, or could the jury conclude, based upon the evidence, that Manzo had been around that same ether to the same extent that Trapodi had? I don't think so, Your Honor. And here's why. This is so simple and straightforward. This was a marital dispute, obviously gone bad, where, you know, taking the evidence in the light most favorable to the government, Mr. Manzo wanted to punish the new boyfriend of his ex-wife. Mr. Perna wanted a free wedding. And Trapodi- As to impress the folks in the family. As Trapodi- Taking in the light most favorable to the government. That's why he wanted this big deal, right? Trapodi testified he wanted to do it because he couldn't afford to have a wedding. Right. He had no money. That was Trapodi's testimony. And the purpose was to show that he was a good soldier, he was a good provider, that he was advancing in the family. That's what he said. Okay. So let's move on then. Was that evidence? Trapodi testified to it. It came in. Has that not enough to suggest that so Perna was after this big wedding to advance his position and Manzo facilitated this big wedding? Is there enough record evidence to suggest that Manzo facilitated the big wedding? We're going to have to disagree on that. I maintain no. Well, Manzo owned the facility where the wedding occurred, didn't he? Pardon me, Your Honor. He owned the brownstone, didn't he? He was the co-owner of the brownstone. That's facilitation to me. If I own a facility or I co-own it and I give somebody a wedding there, I'm certainly facilitating that wedding. I think you'd agree with that. He hosted the wedding. I guess my question is whether or not there's enough to show that Manzo, Trapodi said that, Trapodi's impression was that the image of Perna was to promote himself in the eyes of the family, so he was a good owner. But is there, what is the evidence, I have to ask your friend this, to show that Manzo knew of that motive on the part of Perna? Frankly, Your Honor, I don't believe that is a close question. The evidence was well short, well short of establishing that Manzo knew of that purpose. With respect to Perna, it's simple, straightforward. I want this done. I'm willing to give you a free wedding. There was never any communication on behalf of Perna that, well, here's the real reason, at least according to Trapodi, that I want to do this, even though what I'm telling you is I just want a free wedding. Trapodi only was able to testify as to a meeting with Mr. Manzo in which he had been introduced. Which he? In which Trapodi himself was introduced by Perna to Mr. Manzo. And in the course of the conversation, he said, this is Mr. Trapodi, he's a friend of mine. I want to get at that, because the government makes a lot out of this thing about he's a friend of mine, and they inaccurately say this from the Bronx tale. It's not, it's from Tiny Brasco. But it wouldn't matter. If the government, I have to ask your friend this, to the extent to which they're taking he's a friend of mine, to suggest that would convey to someone that he's tied into the same crime enterprise that the person whom he's friendly with. And I get the feeling, at least from the way it's argued in the brief, the statement he's a friend of mine is enough to convey to the listener that this guy is involved in murderous crime. Because that's not even the way it came across in the movie. How could it be? It's a generic statement that any person in this courtroom has undoubtedly used many times in their lives. Well, never use it again. I mean, live and learn, obviously. The buddy of mine is a compadre, but no more. Of course. No more friends of mine. A friend of mine is just far, far too generic a statement to possibly have that kind of organized crime connotation. And it's especially noteworthy to point out that the government introduced a tape-recorded conversation that when John Perna himself, several years earlier, had been inducted, allegedly, into the Lucchese family, it was only at that time that his brother, who had already been inducted himself, wised him up, so to speak, as to the connotations, secret code words that members of that organization used. One of them was that we refer to people like us as a friend of ours. Ours. Not of ours. Yes, exactly. Not a friend of mine. But even then, you had to reach a high echelon of involvement, you know, actually be inducted into the family before that wisdom was imparted to you. The notion that anybody off the street would naturally understand that a friend of mine, oh, well, that clearly shows, you know, his involvement in the alleged enterprise. And not only that, that further indicates to me that he's participating in this for the purpose of maintaining and advancing his own role in this charged enterprise. Even people who might have seen The Godfather, who might have seen Donnie Brasco, who might have seen The Sopranos, do not have that level of sophistication to understand the organized crime structure, the way in which the members and the associates relate with one another, how orders flow from top to bottom and vice versa. And frankly, Your Honors, it shows why this case was such a poor fit for a Vicar charge in the first place. I do want to point out, since it's our position that both of the Vicar counts do have to be vacated, that there was a third count, the obstruction of justice slash business records count. Our position, which I believe is well supported by federal law, is that in a case like this, where there was ample, hundreds and hundreds of pages of descriptions of violence, descriptions of organized crime, and description of an enterprise that really has nothing, you know, next to nothing to do with the business records of a catering hall, that that would have to be reversed as well. So you spill over, that if there's a problem on the Vicar, it spills over to the obstruction. Absolutely, Your Honor. And we have United States versus Bruno and United States versus Tellier from the Second Circuit, both of which involve fairly analogous sets of circumstances. Were there motions to sever those counts?  Were there motions to sever those counts? There were not, Your Honor. All right. Thank you, Your Honors. I have reserved the five minutes. Thank you. Good afternoon, Mr. Corn. Good afternoon, Your Honors. Mark Corn for the United States. It is always a privilege to be here. Let me begin with one of the focuses of the argument. I think my good friend is leaving out what followed after the introduction of Lorenzo. This is a friend of mine, Lorenzo. He's going to be taking care of this for us. In isolation, this is a friend of mine capable of many different interpretations. But what follows, this is a friend of mine, is Perna telling Manzo he's going to be taking care of this, that is, the beating. That still doesn't mean you're not going to get a total stranger to take care of it. You're going to get somebody whom you know. I understand that, Your Honor. But then there's, on top of that, there's sort of the context of the meeting. It's taking place outside. It's not in the brownstone itself. It's in the parking lot. It's sort of out of view of at least other people. I don't want people to hear the conversation. What is it? What's your best evidence to suggest that Manzo, let's assume that there's sufficient evidence, the jury to find the reason that Manzo, not Manzo, but Perna got involved in this, was to basically, Your Honor, get a discount, or if not a free wedding, get a discount at the Brown House and ingratiate himself into the mob. What evidence is there that Manzo was aware, and I understand there's some contention as to whether that's enough, but what evidence is there that Manzo was aware of Perna's motive? A few things on that, Your Honor. Of course, you have to look at all of the evidence, not just any one piece of evidence in isolation. You're not subjecting the government's evidence to microscopic review. Rather, the test is mere rationality, right? And so we had, from a number of witnesses, we established the following, that effectively Mr. Manzo had been surrounded by mafia culture for virtually his entire life. We weren't arguing, asking the jury to find that he himself was a member of the Lucchese family or the Genovese family or any of the other five families that operate in this part of the country. We weren't asking the jury to find that, but rather that from the time by his own admission when he was a young boy, he likened himself, and the movie we had referred to as A Bronx Tale, and we never refer to A Bronx Tale to talk about the term, this is my friend and the significance of that, Your Honor. I'm sorry if we left that misimpression. One of his closest friends, Detective Spagnuolo, who said he couldn't remember a time when he didn't know Tommy Manzo, said that the way Tommy Manzo described his upbringing was like that kid in A Bronx Tale. Delivering the cold cuts to the mobsters. Mr. Manzo also admitted to his then-girlfriend, now ex-wife, Dina Canton. She had asked him about this. She was worried about whether Mr. Manzo belonged to the mob because she had heard, understood, that his father had been murdered by the mob. And Mr. Manzo, in response, said, I'm not part of the mob. I'm not part of them. They killed my father. But I know people. Sounds like the scene of the wedding. That's my family. That's not me, Kate. Yeah, forgive me. I don't know that reference, but... The godfather. But it's not just... Dina Canton was speaking with some familiarity because she also testified that for the better part of 25 years, she had been around the Brownstone from the time she was a 15-year-old girl till when she was 40 when she left Mr. Manzo. I don't want to interrupt you. I want you to continue with this. The problem is the jury's got to think, be convinced beyond a reasonable doubt that Manzo thinks that Perna's doing this for something more than getting a huge discount on his wedding. And so far, nothing you've said... I mean, there's a lot of speculation involved. And in the speculative, you can't connect the dots. But in terms of convincing beyond a reasonable doubt, why would that be enough? The fact that Manzo grew up in a mob culture. Why would that be more... I don't want to interrupt you. Go ahead. But I also want to... There's a premise in there that I do most respectfully take issue with, that the only person whose motivation matters here vis-a-vis Mr. Manzo is Mr. Perna's. It's also Tripathi's. Tripathi himself admitted as an associate that he wanted to become a mayor. Well, that's true. That's a good point. That's a good point. And again, I wanted... But I do want to move back to sort of the... And I guess the point I'm trying to make... No, that's a good correction. I'm glad you directed me on that because my postulating was oversimplified. You can't lose... You can't lose... Yeah, but the question is the same. Why would there be enough for the jury to conclude beyond a reasonable doubt that Manzo knew that Tripathi was trying to prove himself to be... To engrage himself basically to Perna. So there is Tripathi's own testimony that what he understood based upon that interaction, his walkaway, his takeaway, and I think Judge Restrepo, you might've referred to this earlier in your questioning to my good friend, Mr. White, that Tripathi's takeaway was that Mr. Manzo knew exactly what I was, that I was on John Perna's crew and that I had to file orders. And in that sense, it's not that Mr. Tripathi is a proxy for the jury, but he's drawing the same kind of rational inference that jurors ultimately drew. They were convinced in the words of Coleman, the Supreme Court case from 2012, the jury was convinced. And so then the question becomes, does their decision pass the bare rationality test? That's all there is. But I wanna get back again to the evidence, the different pieces of the puzzle. Because I admit, this is not an easy case, right? It's a very close case, though, very close. I'll be the first to admit that. We don't have a recording of Tom Manzo admitting, I did this knowing full well that John Perna wanted to enhance his position in the Lucchese family. We don't have a recording like that. But what we do have, and going back to Dina Canna testifying, is that routinely, in the 25 years she was there, who was one of Mr. Manzo's closest friends at the Brownstone? Pat Peachy, an associate of Perna's father, an associate of another made member of the Lucchese family. He goes by the name Blackie in this. And Perna shows up again and again and again. Perna is so much a fixture at the Brownstone that on one of the recordings- Perna and Peachy. Sorry, Peachy, I'm sorry. Peachy is such a fixture at the Brownstone that on one of the recordings we introduced, that is the recordings made by the CFO who was serving as a confidential human source, confidential informant, they're not only discussing what to do in response to the grand jury subpoena, Peachy then starts interjecting and talking about how bad FBI guys are. He's right there in the room as Manzo is discussing what to do with the grand jury subpoena. Admittedly, that's 2019. That's not 2015 when the planning to assault Canton is taking place. But I think it does allow a jury to get a sense of what's in Manzo's state of mind. And more importantly, Peachy is the go-between. The evidence was that Peachy was the one who, in a sense, as the way Mr. Tripati put it, Peachy had sort of brokered this deal. What the record also shows, and this is getting into the- The record shows that Peachy brokered the deal to involve Manzo and Perna in bringing Tripati into it. He needs this taken care of. This is going to be good for the family. That's sort of at a broad level. Tripati's testimony as to what he understood, both Ralph Perna, John Perna's father, and Pat Peachy were saying about why this would be good for everybody. It was going to be good for the family. Okay, everybody- Was not present for any of those conversations. Everybody, of course, Mr. Manzo wasn't present for that, right? I'm getting into, because part of what I'm hearing my good friend argue is that there wasn't sufficient evidence of even Perna's motive, and I just don't think that could possibly fly given the deferential standard review for a jury verdict here. I think there's indisputably- I'd be pushing it too far with that. My concern is Manzo's motive not- And so we have Dena Kanton herself saying, 25 years, he referred to guys like Pat Peachy as wise guys, as old wise guys. She recognized Peachy as part of sort of the old crew. She had been to mob-attended events at the Brownstone and also off-site. We never said that the Brownstone wasn't a legitimate business or had no legitimate clients. Of course it does. But the Brownstone was the kind of place where the Lucchese family would book it for a Christmas celebration in 2006. The Lucchese family. And who shows up at that 2006 Christmas celebration for the Lucchese family? Among others, Maddy Madonna. At the time, sort of the underboss of the Lucchese family. At the events here, the boss of the Lucchese family. The testimony is also that Manzo's constantly at the Brownstone. His own lawyer, in opening statements, said he was working 16 to 18 hours a day. Whenever there was a big event, he moved heaven and earth to make sure the big event went well. I mention this because Manzo's there. A jury can refer that Manzo is present for events like a Lucchese family Christmas celebration. Manzo is there for the Perna wedding. And the Perna wedding wasn't just sort of this modest affair or even not so modest affair. Tripati said it was the most lavish wedding he'd ever been to. I mean, there are photos, which we haven't included in the supplemental appendix. I'd be happy to submit them to the court if you like. But he said it was incredibly lavish. But on top of that, it's attended by the senior leadership of the Lucchese family, including Maddy Medan. Manzo is the one who organized this wedding and basically making it more and more upscale at every step along the way to create this really huge bash. And I think- All that would certainly go to show that Manzo knows the culture. But I'm still concerned with the evidence that would allow a jury to find that Manzo was aware of Tripati and Perna's motivation. Perna's motivation to ingratiate himself into the family. So I do appreciate that, Your Honor. And I, too, agree that this is a- What's the strongest evidence that Manzo knew of Perna's and Tripati's racketeering-related intent? I think, Your Honor, I don't want to answer a question with a question at all. I guess I'd say, I don't think you can look at any one piece of evidence. But the overarching- We've got time. We have it together for us. So we have Dina Canton's testimony, 25 years, saw, heard her husband, then former husband, refer to people like Pat Pichie as wise guys. That wise guys frequented the brownstone. That Pat Pichie was almost always there. Whenever she was there, Pat Pichie was there. Pat Pichie, again, is the guy who introduces, so to speak, identifies Perna as the guy who can take care of this problem for Manzo, okay? That's one piece of evidence. You have Manzo's own admission about, from the time he was a child, being surrounded by this, okay? And I want to- I mentioned this, and I understand that there's a difference between learning about it by reading about it, by watching a movie, by watching The Sopranos, and living it. And our case really boiled down to Manzo lived it. He was surrounded by this culture. So you're saying that's your strongest evidence? No, it's the evidence altogether, Judge Ambrose, is that it allowed a jury to infer that he understood this culture. As Tripati put it, he understood- I'm going to use the term now, you, I don't know if Tripati used that term, but he understood how things like these worked. I want to point to another piece of evidence, though, about why Manzo must have known, must have known, that Perna, and Tripati too, but certainly Perna, had an enterprise-related motive. But Perna was already a MAID member, right, according to you? He was already a MAID member, he was a soldier, and Tripati wanted to become a MAID member, right? Okay, so you're agreeing that Tripati was trying to show what a great- not Tripati, Perna was trying to show he's a great earner, and Tripati was basically trying to get in- And on that score, on the great earner point, it wasn't just the testimony of Tripati, as my friend pointed out too. Special Agent Regina confirmed that, that events like these were very, very significant in the mob world, that you had to show that you were a good, stable earner, that you could produce, that you had things under control. So we had that evidence showing Perna's motive, that it wasn't just to get a free wedding, he wanted a lavish wedding because he wanted to show he was a good earner. He also wanted to get money because he was going to, what we're leaving out, is Perna was going to be reporting to prison for his state conviction in January of 2016. His wife, at that point, they had not yet married, she was, they were expecting their first child. He had to earn money, and one of the ways for him to earn the money, in that respect as well, is the gifts, the incredibly generous, at least I've never, I didn't get $2,000 envelopes at my wedding, Your Honor, but maybe I'll move in the wrong social circles. I think that motive was there too, but after, okay, after now, Mr. Perna is serving his prison sentence, we're now March, April of 2016, there's a recording of Tripathi talking. At this point, Tripathi's not cooperating. He's complaining to Perna about being put on the shelf, being sort of distanced, that the family is keeping him at arm's length, they don't want to deal with him anymore, and his cash sources, he's got to go out and collect money and funnel money up, that's all drying up. At roughly the same time, Tripathi goes to Manzo for money. He goes a second time, and after the second meeting, what happens? Another member of Perna's crew shows up and tells Tripathi, leave him alone, he's John Perna's friend. And what that shows to me, and I think a jury could conclude from that, is that Manzo saw a benefit to working with John Perna, precisely because Perna was a made man in the Lucchese family. I'm going to add another piece of evidence. Dina Canton testified that, in essence, she thought that the people who had beaten up her, who had beaten up her now husband, David Canton, might have been tough guys in the kitchen crew, because her husband, tough guys. No, I thought you said, in the something crew. Kitchen. People working at the Brownstone who worked in the kitchen or otherwise, because she said her husband had tough guys and he had tough guys do stuff like that for him. Mr. Manzo didn't go to people at the Brownstone to do this. He went to somebody he knew was a made member of the Lucchese family. He's caught on one of these recordings also as saying, that guy, meaning John Perna, is a monster, putting on more about the familiarity. Because again, I know, Judge Amber, you're asking, what is your best piece of evidence? I'm just trying to stitch it all together. That recording, okay, he refers to both the father, Perna, and the son. Ralph Perna, the father, John Perna, the son, both made members of the Lucchese family. He calls the father, Ralphie. He calls the son, Johnny. And that suggests a degree of familiarity with who these men are, what they are, that makes it reasonable for a jury to conclude that he must have known and indeed wanted, was all too happy to have John Perna do this, and John Perna's man, Tripati, do this, knowing that they would enhance, they were doing this, at least in substantial part, because it would benefit them vis-a-vis the Lucchese family. He went to the mob. When you look at the intent requirement, how do you distinguish the Second Circuit case in Frampton and the Fifth Circuit case in Hankton? So, a couple of things. I don't think either case sufficiently accounts for what the Supreme Court has said about aiding and abetting liability. I mean, the Supreme Court, Roseman isn't just about the conduct part of aiding and abetting. Roseman spends five-plus pages of the U.S. reports talking about the intent requirement for aiding and abetting liability, and it's knowledge of the circumstances. Hankton is post-Roseman, right? But it doesn't really grapple with Roseman, and so the best case for us on this, what we've cited, is Andino Morales from the First Circuit, which says exactly, which supports our position to a T. Relying on Roseman, it rejected a defense claim that in order to convict, the government has to show that the person who is aiding and abetting the principal wanted the principal to advance in the enterprise. Yeah, and that's not, that's a stronger statement of my concern than I have. My concern is not whether or not Manzo wanted the person, wanted the prisoner to advance, but whether or not he was aware, and I know that's a point. Well, I understand. I mean, that's, and that's, look, the sufficiency argument is not about this higher one. It's, I took it to mean, accepting that we're correct on the way the jury instruction should look, is there sufficient evidence that Manzo even knew? And, Your Honor, again, I've been trying to persuade you, and I hope I have persuaded you, that there is sufficient evidence when you look at this from the fair rationality perspective, because the court can't just simply look at any one piece in isolation. It has to look at all of it. And as I said at one point earlier in my argument, there's a difference between learning about something or reading about it versus living it. And the evidence here showed that Tom Manzo lived in a, lived in a culture heavily influenced by the actions and the rituals and the activities of organized crime, and a very particular kind of organized crime, one of the five families of New York. And therefore, and therefore, he must have known that Perna and Tripodi would enhance their reputation in the mob by showing, by having this fancy wedding. But- And Tripodi by the assault, and Perna by having the fancy wedding. Yes. And if I may elaborate, because I see my time has more than expired, and you all have been very generous. But that's the essence of your argument. That is sort of the, that is the essence of the argument, but it's not rank speculation. It's drawing on his familiarity and his extensive, his, and as testified to by his ex-wife, by his best friend, his familiarity and the fact that organized crime guys, members of the Lucchese family, are constantly around or were constantly around him. He knew who to go to when he wanted something to be done and kept under wraps. He obviously didn't want to be tied to this, but he knew where, and he went to the Lucchese family. He didn't go to somebody else. He went to the Lucchese because he knew about the way things work with that kind of criminal enterprise. Now, it requires inferences. I understand that, but jurors draw inferences all the time. Upon inference, upon inference. I mean, it is. You'll admit this is an incredibly, in terms of the Vicar, it's not a hitting and abetting assault, which is a slam dunk. It's hitting and abetting the racketeering Vicar. But you'll admit it is a really close, maybe you wouldn't put really into it, but it's a close case. So I think any case that depends entirely on, you know, at least very substantial and circumstantial evidence can be viewed as a close case, right? I think, and, but we're allowed to rely upon circumstantial evidence The jury was instructed with no objection from the defense that, of course, they had to look at all the evidence, including circumstantial evidence to figure out what Manzo knew. And one of the greatest criminal defense lawyers of at least my time, Edward Bennett Williams, was famous for saying that there was no x, no x-ray machine has been invented that lets you peer inside somebody's head to figure out why they did what they did. You have to look at their actions, the context to understand. Well, as a former prosecutor, I've made that case many, many, many times. I would not have had to want to, this is a, it's an argument. Well, it's a tough case. I will never say this is a typical case, Judge McKee. This is not a typical case for a bunch of reasons, including the personalities of the people involved. I understand that. But when it comes to sufficiency, again, it's bare rationality. And the evidence here is sufficient on the bare rationality test, because in order to, in order to overturn the jury's verdict, this court would have to find that none of the evidence in the aggregate supports a reasonable inference that he must have known. Before you sit down, do you want to address the documents argument? You mean the prejudicial spillover? Question of evidence. Yeah, I mean, a couple of things. One, they didn't move under Rule 33, so it's a plain error. Two, they didn't move for severance, and I think that's really important. To me, prejudicial spillover makes the most sense. If somebody has moved for severance and lost, if somebody's moved to exclude whole swaths of evidence, say under Rule 43 or otherwise, and lost, and in that context, if the only reason why the evidence could have come in was the count, which couldn't go forward, it makes more sense to me. But nobody's disputing that we had a good faith basis to bring this. That's not the claim. There's a dispute here, and I commend counsel on their brief. It is a very interesting legal issue to me, how aiding and abetting works in this context, where you have somebody who the government is not alleging was a member of the enterprise, right? And so all those cases sort of fall by the wayside. Instead, we have somebody who is hiring a mob to carry out abetting. And under those circumstances, I don't think prejudicial spillover works quite the same way as it might in other contexts. The other thing I point out is that he had provided a free wedding to a made member of the Lucchese family goes to the heart of the obstruction of justice count. It helps explain why he was not producing the records concerning the wedding. Those records show there were more than 100 pages of records showing that Manzo was the one who was creating at every turn this lavish enterprise. I think it would have been even had it been severed, that would have been a lot of this evidence. A lot of that evidence would have come in. Maybe not all of it. I would not be so bold as to say all of it would have come in in exactly the same way. But I think a lot of it still would have come in. I mean, Pat Pichie is a made, sorry, is an associate, right? He's on one of the recordings we introduced. And when they're talking about how to respond to the grand jury subpoena and sort of the context for why he would be especially concerned about responding to that grand jury subpoena, I think it's, you know, that it involves a wedding that he hosted for a made member of the Lucchese family. I think that adds something to the government, a legitimate something that the government approves. And so under those circumstances, I really don't see how on an unpreserved prejudicious spillover claim this court could vacate and remand for a new trial the obstruction count. But I hope we're not there, okay? But I, as you can imagine, and as I began with, it's always a privilege to be here and it is, Your Honors. And thank you for giving me the opportunity to argue on behalf of the United States. It is always a privilege to do so. And thank you for the kind words you said about. And on that one, I'd especially like to thank CJA counsel. I don't believe Mr. White is CJA counsel, but as a general matter, CJA counsel had not been paid for quite some time. It's amazing what they do. And on my own personal level, I'm not speaking for the department. I think they do the closest thing to God's work in this system. But back to this, bare rationality is the test. We think there's enough here under Coleman and under Caraballo-Rodriguez. Sort of one last point on that before I close. My good friend cited Cartwright in talking about how there had to be, how the inference had to be, closely, logically connected to a fact and evidence. Cartwright was abrogated unanimously by this court en banc in Caraballo-Rodriguez. The job of this court is this court said unanimously in Caraballo-Rodriguez, and I know you all know this. You know this better than I do. You've been applying that standard dutifully ever since Caraballo-Rodriguez is in all sufficiency cases. It's not the court's job to weigh which is the most plausible inference, but rather because the jury found that way. That's the jury's job. It's whether that inference fails the Bayer Rationality Test. The inference the jury drew here doesn't. We believe the evidence is sufficient. We believe the jury instructions, which we've not focused on, are absolutely faithful to Roseman and Ocasio. And for those reasons, we ask that the judgment of conviction and the sentence be affirmed. Thank you. Thank you, Your Honors. Just working backwards, I would like to say thank you. Thank you, Your Honors. This is my first time appearing in this court. It's an honor and a pleasure. Thank you for having me. I do want to point out, and thank you to Mr. Coyne, I do serve the CJA Council in many cases. Well, thank you for having me. Perhaps not this one, but I appreciate the appreciation we've been shown. Hopefully, we'll see you again, Mr. White. I certainly hope so. Very good argument. You both counsel here are really incredible. It's a real honor to have this level of argument. Thank you. With respect to the documents, I do want to point out, again, there are hundreds and hundreds of pages. Let's assume that there obviously had to be some sort of basis presented to a jury to understand what this investigation was. That could have been done in pretty summary fashion without having to introduce the history of the Lucchese family, the violent acts of the various people involved. None of that was necessary. And I submit to you, none of it would be necessary in a standalone documents case. The fact is, at this trial, all of that evidence came in. It could not have not been prejudicial. There was a 403 objection, I assume, to a lot of that? I'm sorry? There was a 403 objection, there was a 404B objection to a lot of that? I can't really speak. I think there- Sounds like a no to me. There would be. There certainly would be at any future trial. No, was there? Was there in this case? Was there in this case? Pardon? I don't believe there was, I want to just-  With respect, my friend made a lot of references to obviously his interpretation of the evidence that Mr. Manzo grew up in, lived in this world, was intimately involved in. And frankly, it's an egregious overstatement. The testimony was that he served, you know, an offhand remark that when he was a little boy, he served sandwiches at his father's card games. Matthew Madonna's name came up multiple times during my friend's argument. Mr. Manzo has no idea who Matthew Madonna is. He has no idea who any of these people are. The Brownstone was the premier catering hall in that area. And yes, frankly, your honors, I worked catering jobs when I was in college and in law school. You had any number of people coming in. Some people you'd say, yeah, he seems like he's somebody important. But the bottom line is they served the people who came there. They had no idea who any of these people were. And more importantly, with respect to the fact that he may have had acquaintance with some organized crime people as an adult. We cited many cases in our brief pointing out that mere involvement in organized crime, and, you know, Judge McKee, you were obviously focused on this quite a bit. There's a big difference between, oh, yeah, you know, I believe that guy's a mobster, or, you know, that's what everybody thinks, which is usually the way it's phrased. There's a big difference between that and having an understanding, as the law very clearly requires, and as many cases have held, that he has to have actually understood, even assuming the instruction here was correct, he has to have known that their purpose, not just the, oh, yeah, these guys are mobbed up, you know, the reason they might be chosen, you know, yeah, you know, those are violent people. Those are dangerous people. Those are the people who might do something like this. Not, obviously, you know, they're hoping to gain in their status in an organized crime family. On the bottom line is there was never any discussion of this. The agreement was simple and straightforward. You do this, you'll get a free wedding. It sounds like you're arguing to the jury. And they're saying that the instruction to the jury was, in effect, was the court correct in this instruction that it could find Manzo guilty of aiding the betting and conspiracy to commit the bi-car offenses if it found he knew of Perna or Tripoli's racketeering purposes. Yeah, so they have, that if is important, they have to make that conclusion. And Mr. Coyne gave us examples of what he thinks was going through their mind in terms of the evidence presented to them. And they did make that deduction based on that evidence. In that context, what is wrong with just leaving the jury to make that decision even if you might not make it? It has to be, I mean, I think the government has acknowledged, I think the court recognized, and we certainly maintain, there was no direct evidence of any such knowledge. So to the extent that there was circumstantial evidence, which I've just discussed, any inference derived from that has to be a reasonable inference. What is unreasonable about Manzo wanting a favor done in order to get retribution for someone he thought that had done him wrong? And he goes to Perna. Perna gets a lavish wedding for free. And Tripoli, the evidence was that Tripoli gets to put himself in a position where perhaps later on he can become a fully made member. Now, maybe you disagree with it, you put on other evidence, but if the jury buys that based on that instruction, what is wrong with the instruction? Anything wrong with the instruction? Let's assume the instruction was correct. The real question is... In the instruction, was that a model instruction, by the way? It was a model instruction, which as trial counsel pointed out, there is no specific Third Circuit instruction with respect to Vicar. So, our position, of course, is... Basically, this was for Pinkerton liability, I think. Is that correct? Well, with respect to Pinkerton liability, there has to be proof of a shared intent with respect to the conspiracy, which conspiracy had to include the intent to advance or maintain position in an organized crime family. There was obviously no agreement with respect to that on behalf of Mr. Manzo. But with respect to the jury's conclusion, what... And I apologize for posing a question to the bench, but it's the only way I know how to answer this. What was the actual evidence that... knew of the purpose? What was the evidence that he could have known of it? There's never... That was his term. He tried to weave that together for us by taking a lot of by themselves innocuous, relatively innocuous factors, putting them together and then saying, step back and look at this tapestry of these individually innocuous factors. The big picture that emerges from that is that there's enough there that a reasonable juror would have known beyond a reasonable doubt, would have been convinced beyond a reasonable doubt that Manzo knew of the underlying motivations of Cipolli and Manzo. I'm not saying I agree with that. I'm sorry, Perna. I'm not saying I agree with that, but that's his argument. Yes, and obviously zero plus zero plus zero plus zero plus zero still equals zero. He's arguing these are not zeros. They're not big numbers. They're little tiny numbers. They are zero. Added up to a big number. Each one of them is zero. None of those, serving sandwiches, holding a wedding at which organized crime figures are there, acknowledging that he knows members of organized crime. None of those things indicate that he understands the purpose. And Judge McKee, you were very focused on this in your questioning, both of myself and of my friend. It's troubling me, Franklin. It's troubling me. And for good reason. I believe that is the crux of this question. What is the evidence of that? Yes, there was evidence that he recognized that these people were involved in organized crime. But no, there was no evidence that he understood what their purpose was. And nothing Tripodi said. I think what the governor's saying, if he knew that much about organized crime, wouldn't he know that this fancy wedding and an assault on somebody to facilitate the fancy wedding would advance their position within the family? I apologize in advance for this, Your Honor. But that begs the question. Because he knew that much. What did he know? He knew that he served sandwiches. He knew more than that. He knew more than that. It requires speculation. It's all it is. This is the entire thing asks the jury to speculate, to engage in conjecture because there is no evidence. Isn't that circumstantial evidence? I mean, that's the essence of circumstantial evidence. Circumstantial evidence is not conjecture. It's not speculation. The Tripodi, you know, yes, his testimony is evidence. Part of his testimony is we never discuss this stuff with others. And yes, I realize the government's argument was that, oh, but, you know, he wasn't really an outsider. He owned a catering hall. He was a little kid who served sandwiches. But he could certainly put on a lavish wedding too. I would imagine. And, you know, I believe Mr. Manzo would proudly say he'd put on lavish weddings for everybody. That's more than just serving sandwiches.  That's more than just serving sandwiches. Sure, but, you know, he was in the catering business. They, that's what they do. He wanted to serve the people who came to him, including law enforcement, including hospital staff. That's what they did. Thank you very much, Mr. White. Thank you, Your Honor. I'm going to ask that the transcript be prepared and I'll ask the government to paper the transcript. Not you, Mr. Gorin. Yeah. Take it upstairs. Thank you. Thanks. Thanks to all counsel for the briefing and the arguments. Thank you.